INHABITANTS OF QUINCY *vs.* CITY OF BOSTON.

Suffolk.    November 13, 14, 1888. — January 5, 1889.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Boston Waterworks — Authority for Extension — Statute.*

The St. of 1846, c. 167, and the St. of 1872, c. 177, authorizing the city of Boston to procure and distribute a supply of water, confer no right upon the city to convey water to Long Island in Boston Harbor.

BILL IN EQUITY, filed October 10, 1888, to restrain the city of Boston from excavating highways in the town of Quincy, in

laying water pipes from the Chestnut Hill Reservoir to Long Island in Boston Harbor, by way of Moon Island. Hearing on the pleadings and agreed facts before *Field,* J., who reserved the case for the consideration of the full court. The material facts appear in the opinion.

*A. Russ & W. G. A. Pattee,* for the plaintiff.

*A. J. Bailey,* (*R. W. Nason* with him,) for the defendant.

HOLMES, J. The question before us is whether St. of 1846, c. 167, and St. of 1872, c. 177, authorized the city of Boston to lay water pipes from the Chestnut Hill Reservoir, along a public highway in and belonging to the town of Quincy, for the purpose of conducting water to Long Island in Boston Harbor, by way of Moon Island.

This is not a question of direct conflict between the two public uses, the waterworks and the highways, so that we get but little light from cases like *Newburyport Turnpike* v. *Eastern Railroad,* 23 Pick. 326, 327, *Springfield* v. *Connecticut River Railroad,* 4 Cush. 63, 72, and *Commonwealth* v. *Fitchburg Railroad,* 8 Cush. 240, cited in argument. We shall assume that, if the city has power to carry water to Long Island, it has incidental power to carry it through the highways of Quincy; and having in view the general scope of the acts, we shall deal with the question whether the city has power to carry water to Long Island as simply a question of the fair meaning of the words used, unhampered by any artificial rules of strict or liberal construction. If, however, the city has not the power to supply Long Island, then the present digging up of the Quincy highways is wrongful.

St. of 1846, c. 167, is entitled " An Act for supplying the city of Boston with pure water." By § 1, the city is authorized " to take, hold, and convey to, into and through the said city the water of Long Pond," now Lake Cochituate, etc., and to " take and hold, by purchase or otherwise, any lands or real estate necessary for laying and maintaining aqueducts for conducting, discharging, disposing of, and distributing water, and for form-. ing reservoirs." The section contemplates that the lands taken may be in different counties. By § 2, the city may build permanent aqueducts from the said water sources to, into, and through the city, " may make and maintain reservoirs within

and without the said city," and "may distribute the water throughout the city, and for this purpose may lay down pipes to any house or building in said city," and "may, for the purposes aforesaid, carry and conduct any aqueducts, or other works, by them to be made and constructed, over or under any watercourse, or any street, turnpike road, railroad, highway, or other way, in such manner as not to obstruct or impede travel thereon; and may enter upon and dig up any such road, street or way, for the purpose of laying down pipes beneath the surface thereof, and for maintaining and repairing the same ; and, in general, may do any other acts and things necessary, or convenient and proper, for the purposes of this act." By § 6, a remedy is given for all damages sustained by the taking of land, etc., for the purposes of the act.

Long Island was a part of the city of Boston when this act was passed. Certainly, therefore, it would be hard to say that a power to lay pipes to " any house or building in said city " would not apply literally to a house on Long Island, however strictly words might be construed. Yet, *a priori*, it is improbable that when the Legislature passed this act any member of it ever thought of a little island in Boston Harbor, nearly three miles in a straight line from the nearest part of the city, as it then was, on the mainland, even if there were houses there at that time. This conjecture makes no difference, of course, if the language of the act is clear, but it warrants a careful scrutiny of the words used. Now it is to be observed that the power to lay down pipes to any house in said city, supposing it to refer to any other pipes than those which will connect the house with the aqueducts already provided for, is given only for the purpose of distributing the water " throughout the city." The word " throughout " carries with it a suggestion of continuity in the distribution, and confirms the *a priori* doubt whether a leap of several miles was contemplated. So the aqueducts from the water sources may be built " to, into and through " the city. Plainly, the act contemplates these aqueducts reaching the city on its land side, and then running continuously within, but not beyond, the city limits. Then comes the clause as to conducting the aqueducts over or under any watercourse or way " for the purposes aforesaid."

It is inconceivable that the Legislature should have specified with such minuteness watercourses and the various kinds of ways which might be entered upon and dug up, and then should have made no mention of Boston Harbor, if it had contemplated a great work extending into it for miles, or if "the purposes aforesaid" had not been confined to the distribution of water throughout that continuous portion of the mainland which alone is meant when Boston is spoken of in common speech. It has not been the practice of the Legislature to allow interferences with the harbor except under supervision or rules. Harbor lines had been established at that time, and it was expressly forbidden to extend any "incumbrance of any kind" into tide water in the harbor, without leave being first obtained from the Legislature. St. 1840, c. 35, §§ 6, 7. When the Legislature gave leave, it was likely to do it unequivocally and in express terms.

Subsequent legislation cannot be used, simply as such, to construe earlier. But the fact that the city has applied for and has accepted, and that the Legislature has granted, special legislation which would have been unnecessary if its present claim of power is correct, has a certain weight as a practical construction of the statute by the parties interested. Of course we do not disregard the suggestion on the other side, that these acts were obtained *ex majori cautela.* The late statutes are St. 1849, c. 187; St. 1864, c. 271; St. 1865, c. 131; St. 1869, c. 193 and c. 447; and St. 1871, c. 185.

The first of these acts, passed only three years after the one before us, provides that Boston is "hereby" authorized to convey the water of Long Pond to East Boston (which was part of Boston in 1846) by laying water pipes through Charlestown and Chelsea, and, further, that the city on certain conditions may make suitable structures for the purpose of conveying the said water over or under the tide waters within the jurisdiction of the Commonwealth. The inferences from this act are obvious. East Boston was not continuous with what may be called the city proper, but was separated by other towns and by tide water. It hardly could have been supposed that the Legislature of 1846 did not remember the existence of East Boston, and that it was a part of Boston; yet even in so conspicuous a

case as that a new act was thought necessary, or at least desirable. In this act the power to cross tide waters is mentioned for the first time. We ought to add, that, although the language is general, yet as it is in the same section (§ 3) as the other powers given, and as it was necessary to cross tide waters in order to reach East Boston, the power must be limited to the subject matter with which the Legislature was then dealing. Indeed, the city did not attempt to base its claim of right upon this statute.

As it is admitted that, if the later legislation was necessary, the statute of 1846 did not confer the power claimed, we do not think it necessary to do more than to refer to the other acts cited, and to call attention to the fact, that, whatever authority is given to cross tide waters, it is always subjected to conditions and precautions. St. 1869, c. 193 and c. 447. For the reasons stated, we are of opinion that St. of 1846, c. 167, must be construed not to give the city power to lay pipes to Long Island.

St. of 1872, c. 177, does not need so careful an analysis. We assume, without argument, that the city has the right to distribute the waters of the Sudbury River, taken by that statute, through all the pipes previously authorized to be laid down for the purpose of distributing the waters of Lake Cochituate. We assume that its power to maintain its aqueducts and pipes is not diminished in the slightest degree by the fact that Sudbury, as well as Cochituate, water is sent through those pipes. But after having granted various special authorities to cross tide waters, (none of which extend to Long Island,) and thus having manifested that in its opinion at least such authority was necessary, the Legislature omits all mention of power to cross tide waters when it passes this act. The inference is inevitable, that no additional power of that kind was granted.

*Injunction to issue.*